**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JAMES BOYD JR.** *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **15-3068 PJM** |
| | * | |
| **SFS COMMUNICATIONS, LLC** *et al.*, | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Plaintiffs in this class action are cable television, internet, and telephone technicians who have sued their employer, Defendant SFS Communications, LLC ("SFS"), a subcontractor to Defendants CU Employment, Inc. and Communications Unlimited Contracting Services, Inc. (collectively "CUI"), as well as individual Defendant Ferdous Sharif, who owns and operates SFS.[1] Plaintiffs allege that, among other violations, Defendants failed to pay them overtime compensation, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-413 and 3-415, and the Maryland Wage Payment and Collection Law ("MWPCL"), *id.* §§ 3-502, 3-503, 3-505, and 3-507.2. The Court entered default judgment against SFS and Sharif (collectively "SFS defendants") on December 13, 2018. Plaintiffs and CUI have since filed cross-motions for summary judgment and have stipulated, based on those motions, that the Court should make a final decision on the merits of the case. Following oral argument on the principal motions and

---

[1] Four additional original Defendants (Communications Unlimited, Inc; Communications Unlimited Marketing Services, Inc.; Martin Rocha, president of Communications Unlimited; and Jack Spears, regional manager of Communications Unlimited) were voluntarily dismissed from the case on October 29, 2018. Stipulation of Partial Dismissal, ECF No. 109.

subsequent supplemental briefs, the Court now makes its decision on several merits issues, subject to supplemental briefing on the issue of damages, as hereinafter directed.

## I. Factual Background

Plaintiffs, as indicated, are installation and service technicians who serviced the private homes of Comcast customers while employed by SFS, a subcontractor to CUI, which has a contract with Comcast. Mem. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' MSJ") at 3, ECF No. 123-1. In addition to subcontracting with SFS for technicians, CUI employed its own technicians. *Id.* Plaintiffs aver that both CUI and SFS technicians were managed by CUI supervisors, were assigned jobs the same way, communicated with the same CUI dispatchers, worked out of the same warehouses, attended the same CUI-led meetings, and performed the same installation and repair work. *Id.* at 4. While CUI technicians recorded their work hours in CUI's electronic timekeeping system, SFS technicians did not record their work hours at all. *Id.* CUI technicians were paid at least minimum wages and appropriate overtime compensation, according to their recorded hours, whereas the SFS technicians received no overtime pay and state that they were sometimes paid less than minimum wage when accounting for overtime hours and improper deductions taken from their paychecks. *Id.*

Prior to 2012, SFS technicians were assigned jobs through paper work orders, which required them to report to a warehouse each morning to receive work orders from CUI dispatchers for that day and to return completed work orders from the previous day. Mem. in Supp. of Defs.' Cross-Mot. for Summ. J. ("CUI's MSJ") at 5, ECF No. 128-1. Beginning in late 2012, work orders were assigned electronically, so that technicians were able to go directly from their homes to their first job, unless they needed to visit the warehouse, for example, to retrieve or return installation equipment. *Id.* at 6. During the winter of 2013, Comcast began using a digital system known as

Workforce (WFX), or TechNet, to track the status of technicians in the field. *Id.* Technicians used this system to log status updates to indicate when they were en route to a job, had arrived at a job, were on break, or were done for the day. *Id.* at 6–7. Although the WFX system was able to collect some data based on the technicians' status updates ("Comcast data" or "Comcast WFX data"), throughout both the paper work-order period and handheld-device period SFS and CUI failed to track the hours the SFS technicians worked. *See* Pls.' MSJ at 5, 9.

Although the precise number of days and hours Plaintiffs worked per week is undetermined, *see infra* section III.D, both Plaintiffs' deposition testimony and the Comcast data clearly establish that Plaintiffs did in fact regularly work overtime hours for which they were not paid and routinely worked more than five days per week, *see* Pls.' MSJ at 6–9 (summarizing the ten testifying Plaintiffs' depositions, estimating 22.5 to 44 overtime hours of work per week); CUI's Damages Mem. at 21 (estimating 2.5 overtime hours per week), ECF No. 186. In addition, SFS technicians had deductions taken from their wages for phones, tools, tickets, and miscellaneous items such as missing equipment, damages to vehicles or property, and chargebacks for jobs deemed not performed up to specification. *See* First Decl. of Noah Smith ¶¶ 7, 12, ECF No. 123-30. Plaintiffs claim they did not know what some or, indeed, what any of these deductions were for and submit that, in any event, they never provided SFS or CUI with written authorization to make such deductions. *See* Pls.' MSJ at 16–17.

## II. Procedural History

Plaintiffs initiated this suit on October 8, 2015, as a putative collective action under the FLSA and a putative class action under Federal Rule of Civil Procedure 23. Compl. ¶¶ 1–2, ECF No. 1. On January 27, 2017, pursuant to 29 U.S.C. § 216(b), the Court granted conditional certification of the FLSA collective defined as "all current and former technicians/installers who

performed installation and repair work in Maryland, Virginia, and Washington, D.C., for [SFS] at any time from December 4, 2012, to the present." Mem. Op. at 4, ECF No. 48. Ultimately, 57 individuals opted in to the collective action, including the named Plaintiffs. Hr'g Tr. at 3:20–4:7 (Aug. 12, 2020), ECF No. 172.

On August 15, 2017, the Court referred the case to Magistrate Judge Sullivan for handling discovery and related scheduling issues. Order of Ref., ECF No. 66. After the SFS defendants repeatedly failed to comply with discovery requests, Plaintiffs moved for default judgment on June 6, 2018. Mot. for Entry of Default J., ECF No. 95. On September 5, 2018, Magistrate Judge Sullivan issued a Report and Recommendation suggesting that the Court enter default judgment against the SFS defendants. The Court adopted the Report and Recommendation on December 13, 2018. Order, ECF No. 114 (adopting R. & R., ECF No. 101).[2]

On March 29, 2019, Plaintiffs moved for partial summary judgment against Defendants still in the case (i.e., collectively CUI) and to certify the class under Rule 23 with respect to the Maryland state law claims. Pls.' MSJ at 1; Mot. for Class Certification, ECF No. 124. On May 14, 2019, CUI filed a cross-motion for summary judgment. CUI's MSJ at 1. On December 12, 2019, the Court held oral argument on the parties' summary judgment motions and Plaintiffs' motion to certify. Mot. Hr'g, ECF No. 146. On December 16, 2019, the Court granted class certification pursuant to Rule 23 but deferred its decision on summary judgment pending supplemental briefing as to the effect that the default judgment against the SFS defendants might have on CUI. Order, ECF No. 147. The Maryland class, as finally certified, is defined as "all individuals who were

---

[2] Damages and attorneys' fees will be determined at the same time and in the same manner as against the non-defaulting defendants. R. & R. at 12.

directly employed by SFS anytime from September 24, 2012, until July 1, 2018, who performed cable installation work in Maryland for CUI." Notice of Class Action at 1, ECF No. 150-1.[3]

Supplemental briefing on the effect on CUI of the default judgment against SFS concluded on February 20, 2020. The Court held oral argument on the supplemental briefing on August 12, 2020. During the hearing, counsel for Plaintiffs and CUI stipulated that the Court could make a final merits decision based on the record before it. Hr'g Tr. at 12:6–10. While the Court's decision was pending, the parties provided written submissions on the issue of damages, to be considered in the event that the Court were to find in favor of Plaintiffs on the merits.

### III. Discussion

#### A.  Effect of Default Judgment against SFS

Although it is an old case, *Frow v. De La Vega*, 82 U.S. 552 (1872), remains the leading authority on the effect that a default judgment against one defendant should have on non-defaulting defendants. 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2690 (4th ed.); *see, e.g.*, *Grim v. Balt. Police Dep't*, No. ELH-18-cv-3864, 2019 WL 5865561, at *29–30 (D. Md. Nov. 8, 2019). In *Frow*, the Supreme Court held that a court may not enter final judgment on the merits "separately against one of several defendants upon a joint charge against all, where the case is still pending as to the others." 82 U.S. at 554. The principle behind this rule is to avoid the "absurdity" of contradictory judgments against different defendants based on the same claims. *Id.* The Supreme Court instructed that, in circumstances where one joint defendant defaults, the court should "enter a default and a formal decree *pro confesso* against him" and proceed with the matter as to the remaining defendants. *Id.* In other words, the defaulting

---

[3] The parties initially identified 158 potential members of the Maryland class, but four purported members appear to have performed no cable installation work in Maryland during the relevant period, bringing the final number of class members to 154. CUI's Damages Mem. at 40, ECF No. 186.

defendant loses its standing in court, but final judgment will ultimately be rendered for or against all defendants, including the defaulter.

The Fourth Circuit later extended the *Frow* rule to cases where liability is joint and several, as well as in some instances where codefendants' liability is alleged to be "closely interrelated." *U.S. ex rel. Hudson v. Peerless Ins. Co.*, 374 F.2d 942, 945 (4th Cir. 1967). In *Peerless*, the district court had entered default judgment against one defendant who shared joint and several liability with a remaining defendant. *See id.* The Fourth Circuit held that the default judgment would "be treated as interlocutory," "subject to revision" if necessary once the issues were decided on the merits as to the remaining defendant. *Id.*; *see also, e.g.*, *Kelly v. Conner*, 769 F. App'x 83, 87 n.1 (4th Cir. 2019) ("Where a defending party establishes that plaintiff has no cause of action[,] whether on a motion to dismiss or a motion for summary judgment[,] this defense generally inures also to the benefit of a defaulting defendant." (cleaned up)).

In the present case, the parties have stipulated that SFS and CUI (including CU Employment, Inc. and Communications Unlimited Contracting Services, Inc.), besides being codefendants, were joint employers during the relevant period. What effect, if any, should the default judgment against the SFS defendants have on CUI's liability as a joint employer? *See generally Hall v. DIRECTV, LLC*, 846 F.3d 757, 779 (4th Cir. 2017) (holding that defendants, as joint employers, "may be held jointly and severally liable" under the FLSA for uncompensated overtime work).

Clearly, neither the language of *Frow* or *Peerless* nor the principles underlying those decisions indicate that a default judgment against one joint defendant results in *automatic* liability on the part of the remaining joint defendants should they fail to oppose the default judgment. On the contrary, such a result would be antithetical to the interest of justice, since it would deprive

any non-defaulting defendant of the opportunity to present any defense against the plaintiff's claims based on no fault of its own. Accordingly, the default judgment against the SFS defendants does not render the remaining defendants automatically liable here.

## B. Effect of Joint-Employer Status

That said, the question remains whether CUI may be liable based on its failure, as a joint employer, to defend SFS on the merits. Does this suffice for liability under the FLSA and Maryland labor law, regardless of whether CUI was independently liable? The Court concludes that, once SFS is shown to be liable, the answer is yes.[4]

"[A]ll joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA], including the overtime provisions." *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 305 (4th Cir. 2006) (quoting 29 C.F.R. § 791.2(a)). "Under these circumstances, each joint employer may be held jointly and severally liable for the FLSA violations of the other, in addition to direct liability for its own violations."[5] *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 148 (3d Cir. 2014); *see also, e.g.*, *Watson v. Jimmy John's, LLC*, No. 15-cv-6010, 2015 WL 8521293, at *3 (N.D. Ill. Nov. 30, 2015) ("[W]hether an entity is liable under the FLSA as a joint employer is a merits issue."). *See generally Hall*, 846 F.3d at 774 (explaining the "one-employment theory" of FLSA joint-employer status).

---

[4] Plaintiffs state, and CUI does not dispute, that the parties' stipulation that CUI was a "joint employer" fits the definition of that term under the FLSA, 29 U.S.C. § 203(d), MWHL, Md. Code Ann., Lab. & Empl. § 3-401(b), and MWPCL, *id.* § 3-501(b). Accordingly, joint liability applies to the claims under all three laws.

[5] Joint-employer liability under the FLSA is distinguishable from joint-employer status under other federal and state laws. For example, under Title VII, "joint-employer liability does not by itself implicate vicarious liability." *Torres-Negrón v. Merck & Co.*, 488 F.3d 34, 41 n.6 (1st Cir. 2007); *see also, e.g.*, *Overpeck v. FedEx Corp.*, No. 18-cv-07553-PJH, 2020 WL 1557433, at *5 (N.D. Cal. Apr. 1, 2020) (distinguishing joint-employer status under California Labor Code, for which "there was no vicarious liability," with that under FLSA, "which imposes joint and several liability on joint employers").

Against this background, the Court concludes that the burden was on CUI, as a joint employer, to defend *all* joint defendants against Plaintiffs' claims. Indeed, CUI itself appears to concede that if Plaintiffs establish that either SFS or CUI "did in fact violate the FLSA, the non-defaulting joint employer [CUI] would indeed be jointly and severally liable for the conduct of the defaulting joint employer [SFS]." Suppl. Br. of CUI Defs. at 1, ECF No. 151. CUI further concedes that it "did not challenge the merits of Plaintiffs' claims against SFS." *Id.* at 6. Accordingly, the Court looks to the evidence Plaintiffs have proffered in support of their allegations against both SFS and CUI and concludes that Plaintiffs should prevail on the merits as to their claims for unpaid overtime and unlawful deductions.

### C.  Liability of Joint Defendants

#### 1.  Uncompensated overtime

"The FLSA and its 'State parallel,' the MWHL, require that an employer 'pay an overtime wage of at least 1.5 times the usual hourly wage for each hour over 40 that [an] employee works during one workweek.'" *Newell v. Runnels*, 407 Md. 578, 649 (2009) (quoting *Fiolo v. Frankel*, 373 Md. 501, 513 (2003)). Employees alleging a violation of the overtime-pay requirement must prove by a preponderance of the evidence (1) "that [they] worked overtime hours without compensation," including a showing of "the amount and extent of [their] overtime work as a matter of just and reasonable inference," and (2) "that [their] employer had knowledge, either actual or constructive, of [their] overtime work." *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986) (citing 29 U.S.C. §§ 203(g), 207(a)(1), 216(b)); *accord Bailey v. Cty. of Georgetown*, 94 F.3d 152, 157 (4th Cir. 1996).

The Court has no trouble concluding that Plaintiffs have proven both elements of their claim as to SFS. Regarding the first element, because SFS (as well, in fact, as CUI) failed to keep

required records of the hours worked, Plaintiffs "need only produce sufficient evidence to show the amount and extent of the work improperly compensated for 'as a matter of just and reasonable inference.'" *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985); *see also Martin v. Deiriggi*, 985 F.2d 129, 132 (4th Cir. 1992) ("Where an employer fails to keep adequate and accurate records of employees' wages and hours as expressly required by the FLSA, the [plaintiffs'] burden of showing the extent of uncompensated work is reduced."). In the absence of SFS records, Plaintiffs here have produced sufficient evidence that they worked unpaid overtime hours based on the depositions of 10 testifying Plaintiffs as to the average hours they worked per week and, indeed, as confirmed by both sides' analyses of the Comcast data. *See* Pls.' MSJ at 7–8 (citing depositions); CUI's Damages Mem. at 21 (proffering analysis of Comcast data showing average of 42.5 hours worked per week); Pls.' Damages Reply at 13–14, ECF No. 189 (proposing two analyses of Comcast data showing an average of 71.4 and 57.8 hours per week, respectively).

As to the second element—knowledge—it is undisputed that SFS had at least constructive knowledge—and in all likelihood actual knowledge—that its employees were routinely working more than 40 hours per week, yet SFS failed to compensate any of them for any overtime work. CUI has presented no argument disputing that SFS had such knowledge, arguing only that CUI itself did not have the requisite knowledge. But, as indicated, as a joint employer, CUI "knew," at least constructively, what SFS knew, and at a minimum had some oversight obligation as a joint employer. The Court concludes that SFS and CUI, as joint employers, violated the FLSA and MWHL overtime provisions.

Moreover, because the MWPCL requires an employer to pay each employee "all wages due for work that the employee performed before the termination of employment," Md. Code Ann., Lab. & Empl. § 3-505, Defendants' failure to pay overtime wages also constitutes a violation of

the MWPCL. *See generally Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 653 (2014) (explaining that the MWPCL "requires an employer to pay its employees regularly while employed, and in full at the termination of employment," providing an alternative avenue for recovery of unlawfully withheld wages).

### 2. *Unlawful deductions in pay*

Under both the FLSA and the MWHL, an employer is required to pay each employee wages at or above the minimum wage rate for each workweek. *See* 29 U.S.C. § 206; Md. Code Ann., Lab. & Empl. § 3-413; *see also* 29 C.F.R. § 776.5 (providing that minimum wage provision "not limited to employees working on an hourly wage"). Federal regulations further provide that, "in nonovertime workweeks," an employer may make deductions from an employee's wages only to the extent that the resulting wages remain at or above the minimum, excepting deductions for the "reasonable cost" of "board, lodging, or other facilities." 29 C.F.R. § 531.36. Moreover, under the MWPCL, during any workweek, an employer may only make deductions to an employee's wages to the extent they are "authorized expressly in writing by the employee" or "otherwise made in accordance" with the law. Md. Code Ann., Lab. & Empl., § 3-503. *See generally Marshall v. Safeway, Inc.*, 437 Md. 542, 558–62 (2014) (holding that the MWPCL should be read broadly to confer a private cause of action for unauthorized deductions under section 3-503).

Plaintiffs claim that deductions against SFS technicians' wages were made for "phones, tools, tickets, and miscellaneous items, such as missing equipment, damages to vehicles or property, and chargebacks for jobs not performed up to specification." Pls.' MSJ at 16, 31–32; *see* First Decl. of Noah Smith ¶¶ 7–9. Their deposition testimony confirms that such deductions were in fact taken and makes clear, moreover, that SFS in no way obtained written authorization from the technicians to make these deductions; indeed, many Plaintiffs were apparently unaware what

any of the deductions were for. *See* Pls.' MSJ at 16 (citing Miller, Hawkins, Brown, Stout, and Williams depositions). CUI does not contest the fact of these deductions or the absence of employee authorization.

The Court therefore finds for Plaintiffs as to their claim for unlawful deductions under the MWPCL. However, because the question of whether the deductions had the effect of driving Plaintiffs' wages below minimum wage during nonovertime workweeks is dependent on the number of hours Plaintiffs are determined to have worked during those weeks, which has yet to be established, the Court is unable at this point to determine whether such violations occurred under the FLSA and MWHL. This issue will be subject to further briefing, as indicated *infra*.

### 3. *Failure to pay minimum wage*

Plaintiffs appear to advance claims for minimum wage violations that would have occurred solely as a consequence of the unlawful deductions discussed above. *See* Pls.' MSJ at 25–26; *see also* Second Decl. of Noah Smith ¶¶ 6, 9, ECF No. 180-2 (explaining calculation of damages for minimum wage claims). If Plaintiffs were not paid the minimum wage in a given week because improper deductions in fact drove wages below the minimum hourly rate, they have a point. However, if omitting those unlawful deductions from Plaintiffs' paychecks would result in pay above the minimum wage, then there would be no minimum wage violation and they could only recover for the amount of any unlawful deduction.[6] *Cf. Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 709 (E.D.N.C. 2009) (finding certain deductions unlawful where they "reduce[d] a worker's wages for [a given] week below the minimum wage" and directing defendants to "reimburse Plaintiffs up to the point that the minimum wage is met"). Plaintiffs have so far failed to prove that any minimum wage violation occurred separate and apart from the violations

---

[6] To the extent Plaintiffs raise a minimum wage claim dependent on unpaid overtime hours worked, rather than unlawful deductions from their pay, the same rationale applies.

discussed above. Again, further clarification on this issue should come in the supplemental briefing.

### 4. *Willfulness*

The statute of limitations for FLSA claims is three years for willful violations and two years for non-willful violations. 29 U.S.C. § 255(a). A violation is deemed willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). Mere "negligen[ce] is insufficient to show willfulness." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 358 (4th Cir. 2011). The employee alleging the violation bears the burden of proving that the violation was willful. *Id.*

The parties' arguments focus on the question of whether CUI acted willfully with respect to the FLSA violations, apart from the matter of SFS's willfulness. Plaintiffs argue that CUI acted willfully because it had previously been subject to FLSA lawsuits yet took no action in the present case to determine its own or SFS's compliance with the statute with respect to Plaintiffs, nor did it track the hours worked by Plaintiffs in compliance with FLSA recordkeeping requirements. *See, e.g.*, *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999) (finding employer's violation reckless where he relied on a joint employer's representations of compliance in light of the joint employer's past IRS violations). CUI does not dispute that it failed to determine whether SFS was tracking Plaintiffs' work hours or whether SFS complied with the fair labor laws but argues that this neglect does not amount to demonstrating knowledge or reckless disregard on its part because its contract with SFS placed the burden on SFS to track the technicians' hours and pay them in accordance with applicable state and federal laws. *See, e.g.*, *Robinson v. Empire Equity Grp., Inc.*, No. WDQ-09-1603, 2014 WL 6698407, at *5 (D. Md. 2014) (finding that defendants'

failure to implement "specific policies or practices" that would prevent FLSA violations did not rise to the level of reckless disregard).

The Court finds CUI's argument unconvincing. As a matter of contract, CUI may have acted plausibly in leaving the burden of statutory compliance with SFS in the first instance, but the same cannot be said of CUI's total lack of oversight of SFS on this matter, nor SFS's total disregard of what the law requires. The record demonstrates that SFS neglected—utterly—to track Plaintiffs' working hours, nor did it in any way attempt to determine or pay its technicians for overtime work, despite clear knowledge on the part of SFS that Plaintiffs were regularly working overtime hours for which they were never compensated, a legal violation that is, at best, "so obvious that it should be known." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (defining recklessness). Again, the Court finds that the willfulness of SFS equates to the willfulness of its joint employer CUI. Moreover, CUI's total lack of oversight compounds the willfulness. The Court concludes that the three-year statute of limitations applies to Defendants' FLSA overtime violation.[7]

### D. Damages

Plaintiffs and CUI have submitted proposed damages analyses that rely on different evidence and employ different methodologies, depending on certain legal and factual assumptions underlying their respective analyses. Crucially, as to hours worked, Plaintiffs' damages analysis relies exclusively on the estimates of the ten testifying Plaintiffs, whereas CUI's analysis relies on the Comcast data. The Court finds it appropriate to explain why it concludes that the Comcast data are the more reasonable starting point, before considering a number of other issues raised in the

---

[7] The statute of limitations for claims under the MWHL and MWPCL is up to three years and two weeks, even in the absence of willfulness. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101; Md. Code Ann., Lab. & Empl. § 3-507.2; *see also infra* section III.D.3 (discussing applicable statute of limitations).

parties' damages memoranda and before directing the parties to recalculate damages consistent with the Court's findings.

### 1. *Best available evidence*

As stated, a plaintiff "has the burden of establishing the hours he claims to have worked and the work he claims to have performed for which he was not paid." *McLaughlin v. Murphy*, 436 F. Supp. 2d 732, 737 (D. Md. 2005), *aff'd*, 247 F. App'x 430 (4th Cir. 2007). Where, as here, "an employer has failed to maintain required records of the hours worked and wages paid, Plaintiffs need only produce sufficient evidence to show the amount and extent of the work improperly compensated for 'as a matter of just and reasonable inference.'" *Donovan*, 780 F.2d at 1116. Although the evidence need not be exact, "[r]ough estimates of hours worked in a week are not sufficient." *Whittaker v. David's Beautiful People, Inc.*, No. DKC-14-2483, 2016 WL 429963, at *11 (D. Md. Feb. 4, 2016). Once plaintiffs have met their initial burden, the burden shifts to the employer to rebut with either evidence of the precise hours worked or "evidence to negative the reasonableness of the inference to be drawn" from plaintiffs' testimony. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

Plaintiffs base their damages analysis on averages of the testifying Plaintiffs' estimates of the number of days and hours they worked each week. Although these testimonies satisfactorily demonstrate that Plaintiffs were insufficiently compensated "as a matter of just and reasonable inference," CUI persuasively rebuts the extent of the unpaid overtime hours with its own analysis based on the Comcast data. Both sides acknowledge that the Comcast data are imprecise, since the program was not designed to track hours but rather to track the technicians' status throughout the

workday. Nonetheless, the Court finds this data to be the best available evidence, since the approximation of days and hours worked based on this data is generally more reliable than Plaintiffs' various memories of their workdays and hours over an extended period—especially given that technicians were evaluated in part based on their status updates, *see* Suppl. Decl. of Gary McFarlane ¶¶ 18–19, ECF No. 186-5.

### 2. *Calculation of hours*

Even so, because the Comcast data comprise only status updates rather than hours worked, there remain several questions surrounding the calculation of Plaintiffs' hours and workdays based on this data.

**a.** The parties disagree as to whether the time spent between job assignments should count as working hours or as noncompensable off-duty time. Federal regulations provide that "[p]eriods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes," depending on "all of the facts and circumstances of the case," "are not hours worked." 29 C.F.R. § 785.16(a). To be fully relieved from duty, however, the employee must be "definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived." *Id.* There are many circumstances under which waiting may indeed be part of an employee's job; for example, "a messenger who works a crossword puzzle while awaiting assignments" and a "fireman who plays checkers while waiting for alarms" are "working during their periods of inactivity." *Id.* § 785.15. Those are "unpredictable" periods "usually of short duration" that are effectively "controlled by the employer." *Id.*

Here, the Court is not persuaded by Plaintiffs' contention that every moment of every working day between their first and last recorded status can reasonably be assumed to be

compensable on-duty time; on the other hand, neither is CUI right to completely ignore downtime between Plaintiffs' recorded statuses during which they remained available to receive new assignments. The evidence indicates that there were indeed times in between jobs (including when they ran ahead of schedule) when technicians would make themselves available to receive new jobs at a moment's notice. That time should be counted as on-duty time, since it comprises unpredictable periods effectively controlled by the employer. Accordingly, the Court finds that any time between the first and last statuses of the workday during which technicians were traveling to assignments, working on assignments, or remained *available* to receive new assignments should be compensable. Otherwise, any workday period greater than 19 minutes in length between statuses that represent compensable working time should be deemed noncompensable off-duty time.

**b.** Plaintiffs also contend that CUI's analysis wrongly excludes 372 ONJOB statuses that show up in Comcast invoice records but do not appear in the Comcast WFX data. In response, CUI explains that the data used to generate Comcast invoices were derived from the WFX data, such that the invoices only show jobs that originated in the WFX handheld-device system, and any discrepancies between the two are the result of renumbered work orders issued after Comcast adopted a new billing system or of delays in the system. *See* Decl. of Christopher Waters ¶¶ 3–4, ECF No. 186-10. The Court accepts CUI's explanation with respect to these discrepancies and finds that the invoice data should not be used in the calculation of damages.

**c.** Plaintiffs argue that CUI undercounts the average days worked per week in at least two ways: (1) by using a Sunday-to-Saturday workweek, CUI artificially shortens the first and last week of the year, and (2) by only counting days with an ONJOB status CUI eliminates, for example, days in which a technician recorded an ENROUTE status but, upon arriving at the job,

found no customer there. The Court agrees with Plaintiffs as to both propositions and holds that, for the purpose of determining days worked per week, (1) a week that falls between one year and the next shall be considered as wholly in one year or the other (whichever contains more days in that week), and (2) any days during which technicians recorded an ENROUTE status, in addition to all days with an ONJOB status, shall be counted as working days.

**d.** The parties further dispute how much compensable time should be added to each workday to account for "warehouse time," i.e., the time technicians spent traveling to the warehouse, while at the warehouse, and subsequently traveling to their first job assignment, figures not otherwise captured in the Comcast WFX data. CUI's analysis assumes one hour of "warehouse time" each day, whereas Plaintiffs argue for three hours. During the paper work-order period, technicians were obliged to arrive at the warehouse no later than 7:00 each morning to get their assignments for the day; during the handheld-device period, they only had go to the warehouse if they needed to retrieve equipment for the day, inventory their equipment, or attend a meeting. CUI asserts that during the latter period technicians only went to the warehouse a couple times a week, whereas Plaintiffs contend that they continued to begin almost every day at the warehouse. During both periods, the testifying Plaintiffs' reports of when they actually arrived at the warehouse and how much time they spent there vary significantly, from less than an hour to two and a half hours.

The Court attempts to strike a balance. Ninety (90) minutes of compensable time should be added to each workday, recognizing that technicians likely did continue to visit the warehouse on most but not all workdays, generally spent about an hour there (though sometimes more, particularly during the paper work-order period), and tended to log their first status while at the warehouse or when departing for their first job assignment. *See, e.g.*, Boyd Dep. at 49, ECF No.

189-2; Brown Dep. at 30, 32, ECF No. 189-3; Hawkins Dep. at 21–22, ECF No. 189-5; Williams Dep. at 50, ECF No. 189-9.

**e.** The parties further disagree as to whether to exclude nonovertime weeks from the estimated average weekly hours. Plaintiffs explain that taking the exact hours worked during weeks of less than 40 hours as well as those over 40 hours artificially reduces the average overtime hours worked per week. For example, if a technician worked 50 hours during week one and 30 hours during week two, CUI would find an average of 40 hours per week and zero overtime hours, whereas Plaintiffs—essentially by assuming for purposes of the calculation that all nonovertime weeks included 40 work hours—would properly find an average of five overtime hours. *See* Second Decl. of Noah Smith ¶ 22. The Court accepts Plaintiffs' argument: nonovertime weeks shall be assumed to consist of 40 work hours for the purpose of calculating average overtime hours.

### 3. *Additional issues relating to damages for state law claims*

Beyond sparring over the calculation of hours and workweeks, the parties raise four additional issues that affect Plaintiffs' damages recovery under Maryland law.

**a.** The parties disagree on the applicable statute of limitations for the Maryland state law claims.[8] Plaintiffs submit that the statute of limitations under both the MWPCL and MWHL is three years and two weeks. That is sometimes, but not always, true. As a general proposition, the statute of limitations under Maryland law is three years. Md. Code Ann., Cts. & Jud. Proc. § 5-101. Under the MWPCL, this three-year limitation begins tolling two weeks after "the date on which the employer was required to have paid the wages," Md. Code Ann., Lab. & Empl. § 3-507.2; *see Higgins v. Food Lion, Inc.*, 197 F. Supp. 2d 364, 367 (D. Md. 2002); *see also Butler v.*

---

[8] CUI argues that damages are limited to the period covered by available payroll data, which is less than three years. But the availability of specific payroll data cannot shorten the legal limitations period. Class members' wage damages in this case will be based on estimated averages.

*VisionAIR, Inc.*, 385 F. Supp. 2d 549, 554 (D. Md. 2005) ("[A] claim under the MWPC[L] must be filed within three years and two weeks from the date on which the employer should have paid the wage."). This means that a plaintiff can recover damages for *up to* three years and two weeks prior to filing the complaint. In this case, because the complaint was filed on October 8, 2015, Plaintiffs can recover damages for wages owed starting on any payday within two weeks prior to October 8, 2012—i.e., the first payday that occurred on or after September 24, 2012. *See Higgins*, 197 F. Supp. 2d at 367 ("Because Plaintiff filed his Complaint on July 21, 2000, his Md. Wage Law claim is limited to paychecks that should have been or were issued on July 7, 1997 or later.").

**b.** There also remains the question of whether class members can recover damages under Maryland law for weeks during which those members performed no work in Maryland. The Court concludes that they cannot.[9]

In Maryland, there is a general presumption against extraterritorial application of state statutes, and neither the MWHL nor MWPCL contains specific language indicating an intent to apply to work performed outside the state. *See, e.g.*, *Chairman of Bd. of Tr. v. Waldron*, 285 Md. 175, 183–84 (1979) ("[U]nless an intent to the contrary is expressly stated, acts of the legislature will be presumed not to have any extraterritorial effect."). Plaintiffs argue that once a Maryland employer is determined to be "subject to liability for violating [Maryland wage] law," liability extends to all work performed by its employees, whether or not such work was performed in Maryland. But the case that Plaintiffs principally rely on, *Himes Assocs., Ltd. v. Anderson*, 178 Md. App. 504, 535 (2008), does not stand for this proposition; it merely establishes the more

---

[9] To be clear, this finding does not exclude recovery under the FLSA during those weeks for Plaintiffs who have opted into the collective action, because (unlike the Maryland class) the FLSA collective includes those who worked not only in Maryland but also in Virginia and Washington, D.C.

general principle that an employer based outside Maryland can be subject to liability under the MWPCL where it directed its employees to perform some work in Maryland.

To determine the extent to which an employer's liability can extend to work performed outside Maryland, the FLSA provides a useful basis for comparison, since its minimum wage and overtime provisions do "not apply with respect to any employee whose services during the workweek are performed in a workplace within a foreign country or within [other specified jurisdictions]." 29 U.S.C. § 213(f). Under FLSA regulations, employees may recover for any workweek during which they perform at least some work in an FLSA-covered jurisdiction. *See* 29 C.F.R. § 776.7 n.20; *see also id.* § 776.4(a) ("The workweek is to be taken as the standard in determining the applicability of the [FLSA].").

As under the FLSA, the workweek is also the standard for calculating damages under the MWHL and MWPCL. *See* Md. Code Ann., Lab. & Empl. § 3-420(a). It follows that the same standard for extraterritorial work should also apply under Maryland law as under the FLSA—namely, that an employee can recover under Maryland law for any week during which he performed some work in Maryland. *Cf.* 29 C.F.R. § 776.4(a) ("If [an employee] spends any part of the workweek in covered work he will be considered on exactly the same basis as if he had engaged exclusively in such work for the entire period."). Accordingly, the Court finds that Defendants should be liable for violations of Maryland labor law on a week-to-week basis, to the extent that workers performed any work in Maryland, but class members cannot recover damages under Maryland law for weeks during which they performed no work in Maryland, as reflected in the Comcast data.[10]

---

[10] Work orders lacking information as to where the technicians worked shall be assumed to have been performed in Maryland. *See* Suppl. Decl. of Christopher Pieper ¶ 14, ECF No. 186-6 (explaining this assumption was built into CUI's damages analysis).

**c.** Further, CUI asserts that four individuals initially included among Maryland class members should be excluded from the class because they apparently performed no work in Maryland as technicians during the relevant period. In response, Plaintiffs contend that three of those individuals (opt-in Plaintiffs Kweku Agyemang, Laiphone Chanthavong, and Ravon Daniel) were based in Glen Burnie, Maryland, while working for SFS and that the Comcast data show the fourth individual (Gary McFarlane) working as a technician and supervisor for SFS in Maryland during that period.

CUI wins the point. The Maryland class includes only those who "performed cable installation work in Maryland for CUI" during the relevant period. As for Plaintiff McFarlane, he has testified that he worked as a technician exclusively in Virginia until July 2013, at which time he became a supervisor. *See* Suppl. Decl. of Gary McFarlane ¶ 1. In other words, he did not "perform cable installation work in Maryland" during the relevant time period and is therefore not a member of the Maryland class. As for Plaintiff Chanthavong, she apparently worked as an administrative assistant rather than an installation technician. To the extent that there exist no Comcast WFX records indicating the contrary, she also does not qualify as a member of the Maryland class. *See id.* ¶ 21. Similarly, since there is no evidence that Plaintiffs Agyemang or Daniel performed any work for SFS in Maryland during the relevant period, they cannot be considered part of the Maryland class, even if they were based out of Glen Burnie, Maryland. *See* Second Decl. of Jack Spears ¶ 3, ECF No. 186-9; Second Decl. of Noah Smith ¶ 20.[11]

**d.** Finally, Plaintiffs argue in favor of, and CUI against, the availability of treble damages under Maryland law. "Employees seeking enhanced damages are entitled to recover liquidated damages under the FLSA or treble damages under the MWPCL, but not both." *Martinez Perez v.*

---

[11] The Court notes that none of these four Plaintiffs opted into the collective action under the FLSA. *See* Pls.' MSJ, Ex. 1, ECF No. 180-1.

*Cheng*, No. GJH-18-3348, 2019 WL 7049688, at *5 (D. Md. Dec. 23, 2019) (cleaned up). Under the MWPCL, the court, as a matter of discretion, "may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs" if it "finds that an employer withheld the wage of an employee in violation of [the law] and not as a result of a bona fide dispute." Md. Code Ann., Lab. & Empl. § 3-507.2(b). Resolution of the matter turns on "whether the party making or resisting the claim has a good faith basis for doing so, [i.e.,] whether there is a legitimate dispute over the validity of the claim or the amount that is ow[ed]." *Admiral Mortg., Inc. v. Cooper*, 357 Md. 533, 543 (2000). The employer bears the burden of proving a bona fide dispute. *See id.*

Here, CUI has not alleged, nor is there any basis for the Court to find, the existence of a bona fide dispute over the validity of Plaintiffs' claims. From the outset, it has been altogether clear that Plaintiffs were entitled to substantial, even if not precise, compensation for unpaid wages. CUI has not shown that it acted in good faith in denying any and all overtime wages to Plaintiffs. As such, an award of up to treble damages is wholly in the Court's discretion. CUI argues that the existence or absence of consequential damages is a relevant factor in deciding whether to grant treble damages, but there is no statutory requirement that consequential damages be present. *Compare, e.g.*, *Martinez Perez*, 2019 WL 7049688, at *5 (awarding liquidated damages but not treble damages where "plaintiffs fail[ed] to offer any evidence that they suffered consequential damages from the underpayments"), *with Serrano v. Chicken-Out Inc.*, 209 F. Supp. 3d 179, 193 (D.D.C. 2016) (awarding treble damages under MWPCL and finding that "a lack of consequential damages" does not "militate[] in favor of merely doubled, rather than trebled, damages"). But whether or not consequential damages must be shown is ultimately academic. Consequential damages are indisputably present here.

The Court takes special note of the fact that this litigation has been pending for more than five years, and Plaintiffs are owed wages from as far back as September 2012—i.e., for nearly nine years. The Court concludes that it would be unjust to award Plaintiffs simply what they have been entitled to all along. They have lost the opportunity to use fairly earned wages owed them for almost a decade. But inasmuch as there was some basis to dispute the precise amount of damages— though not their substantial magnitude—the Court feels that double, rather than treble, damages under the MWPCL are an appropriate award.

## IV. Conclusion

The Court having found in favor of Plaintiffs and against all Defendants on the merits of Plaintiffs' claims for unpaid overtime and unlawful deductions, counsel for the parties shall submit new damages calculations consistent with the Court's determinations, within the timeline set forth in the accompanying Order, as well as any potential further argument regarding payments below the minimum wage. A separate order will issue.

April __15__, 2021

                                    **PETER J. MESSITTE**
                         **UNITED STATES DISTRICT JUDGE**